Robert A. MILLER, et al., Plaintiffs,

v.

**TONY AND SUSAN ALAMO FOUNDATION, et al.,** Defendants.

Civ. No. 88–2206.

United States District Court, W.D. Arkansas, Fort Smith Division.

April 27, 1990.

Norman Wilkinson, Fort Smith, Ark., Peter Georgiades, Pittsburgh, Pa., for plaintiffs.

MORRIS SHEPPARD ARNOLD,
District Judge.

## MEMORANDUM OPINION

In this case, plaintiffs allege numerous causes of action against Tony Alamo.[1] They assert, first, that Mr. Alamo violated the federal Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206(a)(1) and 207(a)(1), because plaintiffs performed work for him for which they were not paid. Plaintiffs claim, secondly, that Mr. Alamo purported to divorce Robert Miller and Carey Miller from their wives and purported thereafter to join their wives in matrimony with other men; they allege too, that Mr. Alamo engaged in a concerted effort to estrange the Millers' minor children from them by asserting that their fathers were dead, were thieves and embezzlers, and were no longer their fathers. These allegations plaintiffs characterize as alienation of affection. Thirdly, plaintiffs seek to recover on the ground that Mr. Alamo intentionally inflicted emotional distress on them by systematically subjecting them to "extreme, outrageous practices." Some of these acts are the same as those plaintiffs previously

---

1. The plaintiffs' original complaint named several other individuals and two corporations as defendants. All of those defendants have been dismissed under separate orders.

characterized as alienation of affection. Finally, there is a claim captioned "wrongful use of civil proceedings" in which plaintiffs claim that Mr. Alamo initiated and continued an Ex Parte Application for Modification of Temporary Child Support Order for Change of Custody in California, and did so "without probable cause" or "primarily for a purpose other than ... securing the proper adjudication of the claim ... with a malicious motive." Plaintiffs allege in connection with this claim that they were successful in resisting that suit.

Mr. Alamo having wholly failed to answer or appear, the court caused a default judgment to be entered against him. This opinion sets out the reasons for judgment against Mr. Alamo on the plaintiffs' various claims.

### I.

■ It is familiar law that all well-pleaded allegations in a complaint are admitted by virtue of a defendant's default. In this case, plaintiffs have pleaded the facts necessary to establish a violation of the federal Fair Labor Standards Act and for the recovery of liquidated damages under that act. Since these amounts are sums certain, no proof is necessary to establish damages and the court will allow plaintiffs a recovery in the amounts indicated in the judgment.

### II.

With respect to the other claims advanced by plaintiffs, the court is obliged to make a finding concerning damages since those claims are not for sums certain but, instead, for consequential damages. The court has had the advantage of a considerable amount of testimony from the plaintiffs on this issue and will now turn to a discussion of the evidence that bears on it.

The easiest of these damages to calculate are those attributable to plaintiffs' claim for abuse of civil process: Carey Miller testified that he spent $3,383.00 for attorney's fees to fend off a frivolous suit against him and the court finds no difficulty whatever in awarding these to him.

■ The court now turns to the most disturbing of the allegations of plaintiffs' complaint. Plaintiffs assert that Mr. Alamo put on "public exhibitions of corporal punishment, in the form of paddling, upon minor children"; and the proof amply showed that Justin Miller, while being restrained by four adult men, was struck vigorously 140 times with a large wooden paddle by a grown man. The evidence further showed that this punishment was inflicted in a room filled with adults and children and was not only painful (Justin's buttocks were bleeding) but humiliating in the extreme. One of the adult witnesses, indeed one of the principal participants, was Justin's mother.

■ One difficulty in the way of recovering for this atrocious act is that plaintiffs have not directly asked for relief on account of an assault and battery, evidently preferring, instead, though this is far from clear from the complaint, to lay this claim as an intentional infliction of emotional distress. (Count V incorporates the paddling assertion by reference and alleges that "all plaintiffs" were subjected "to humiliation and public ridicule"; this count also asserts that "the plaintiffs" have "suffered physical ... injury.") Of course, plaintiffs can recover only for acts which it can fairly be said Mr. Alamo has admitted by defaulting. Though it is a close question, the court holds that Mr. Alamo has admitted the public paddling of Justin Miller. It is true, too, that reasonable physical correction is not tortious, see, e.g., *Wise v. Pea Ridge School District*, 855 F.2d 560, 564 (8th Cir.1988), and *Berry v. Arnold School District*, 199 Ark. 1118, 1124–25, 137 S.W.2d 256 (1940); see also *Ingraham v. Wright*, 430 U.S. 651, 663, 97 S.Ct. 1401, 1408, 51 L.Ed.2d 711 (1977), and *Dodd v. State*, 94 Ark. 297, 300–01, 126 S.W. 834 (1910), but, in the court's view, public corporal punishment of children is a *prima facie* tort which, if it can be justified at all, needs to be defended by way of answer and proof. The court can, moreover, imagine no offense that could justify the amount of physical force used against Justin Miller in this instance.

■ The court can conceive of no higher duty incumbent on it than the protection of children from outrageous batteries like the one that the evidence here so plainly reveals. No feeling person could fail to be moved by the testimony in this case or to be revolted by the cold-blooded and calculated manner in which the punishment of Justin Miller was carried out. The court awards him $50,000.00 in compensatory damages for his pain, suffering, and humiliation. Nor, in the court's mind, would it be right to allow defendant to go unpunished for this act. It is true that criminal proceedings have been initiated based on the facts presented here; and it is equally true that punitive damages, though an obviously sufficient case has been shown for their imposition, may nonetheless be withheld at the discretion of the factfinder. The court is also aware that punitive damages have been severely criticized because of their capacity for arbitrariness and their unpredictability. But in this case the court has no hesitation in finding that an award of such damages is appropriate. For one thing, Mr. Alamo is a fugitive: He has numerous warrants out for his arrest and the prospects for his apprehension are not clear. It is thus not obvious that he will ever be compelled to account for his offenses in a criminal court. For another thing, it can hardly be maintained that the acts perpetrated here are ones that a reasonable person would not know would earn him the severest kind of censure.

One other difficulty needs to be faced up to. Under current law, a defendant's net worth is a relevant datum in determining an appropriate amount of punitive damages. This manner of looking at things can be and has been intelligently criticized, but there is no question that it is the prevailing law. In this case, the court has had not a little difficulty in determining the net worth of the defendant, but mainly because of his recalcitrance and utter unwillingness to recognize the authority of this court or, indeed, of any other. There was testimony that he boasted of being extraordinarily wealthy, with a net worth in the tens of millions. This may well have been bluster, but it is abundantly plain that not long ago he enjoyed a cash flow of thousands of dollars a day. When the defendant is a wilful fugitive, when it has been shown that he flagrantly defies the law by the fabrication and forgery of financial records, and when the answers to the relevant questions are peculiarly within his knowledge, the court is justified in presuming the worst against him. The court therefore awards punitive damages to Justin Miller in the amount of $500,000.00.

■ Justin Miller also asks to recover for past and future psychiatric and counseling expenses. The court sees a difficulty in the way of awarding these damages that seems to it unsurmountable. There might be no difficulty in concluding that Justin could benefit from psychiatric help on account of what manifestly must have been a harrowing experience. But one of his very able counsellors testified that Justin's experience at the Alamo Foundation had made it very difficult for him to adjust to a new life in California. For instance, she said, he had embarrassed himself and earned the scorn of his schoolmates because he had openly criticized Martin Luther King in class. What this suggests to the court is that the damages sought here are for what might be called deprogramming. The court does not think that it would be proper to award money to Justin on account of any discomfiture experienced by him on account of ideological nonconformity. Courts cannot compel parents and churches to contribute to the inculcation of religious or political beliefs with which they do not sympathize. Religious and political beliefs, no matter how bizarre and nonconforming, are personal matters, and the courts are not instruments of orthodoxy charged with the responsibility of keeping citizens on the ideological straight and narrow. The court therefore declines to award damages of this character.

## III.

Plaintiffs here, as already noted, also asserted that Mr. Alamo has committed acts that amount to an alienation of affection. Specifically, they have averred that he purported to divorce Robert Miller and

Carey Miller from their wives by means of a so-called get, a biblical bill of divorcement, and later purported to marry these women to other men. Plaintiffs Robert and Carey Miller also claim that Mr. Alamo alienated their children from them by telling the children that their fathers were dead, that they were thieves and embezzlers, and that they were no longer legally their fathers. Mr. Alamo also, according to plaintiffs, hid the children so that plaintiffs could not find them.

■ The second of these asserted claims can be shortly dealt with: Arkansas does not recognize as tortious the alienation of one's children's affection. *See Orlando v. Alamo*, 646 F.2d 1288, 1289–90 (8th Cir.1981). Though Mr. Alamo has admitted the acts complained of by his default, the court still has a duty to determine whether those acts are actionable. As they are not, the court dismisses this claim. As for the claim of alienation of the wives' affection, the Arkansas legislature, by virtue of Act 46 of the 1989 session, specifically provided that the "actions of alienation of affection and criminal conversation are abolished," but a savings clause provides that the act does not apply to "litigation pending before the effective date of this act." The effective date of the act was November 14, 1989; this action was filed more than a year previous. Therefore the act is of no effect in this litigation and the claim for alienation of the wives' affection is a good one.

■ An issue that arises in the special context of this case, however, must still be addressed, and that is whether Mr. Alamo's actions are not protected by the First Amendment guarantee of freedom of religion. The question is not whether he may constitutionally be denied the actual power to divorce a man from his wife; the court entertains no doubt that he may. The question is rather a more subtle one, namely, whether Mr. Alamo may constitutionally be deprived of the right to persuade a woman, for religious reasons, to leave her husband and take up with another man. This question might have been attended by the largest difficulties, but the court sees

no necessity of addressing it directly because the complaint alleges that Mr. Alamo committed these acts "to further his scheme ... and to cause further injury to the plaintiffs." Fairly construed, these allegations exclude a genuine religious purpose from the list of possible motives entertained by Mr. Alamo and the court therefore holds these facts actionable.

■ The matter of damages presents a real difficulty. Though plaintiffs testified that they had previously had good marriages, it is not very easy to put a number on a tort of this sort. The Supreme Court of Arkansas has frequently been urged to set aside verdicts in cases like this because they were excessive, but it has never done so. *See, e.g., Hvasta v. McGough*, 276 Ark. 168, 633 S.W.2d 31 (1982); *Hammond v. Peden*, 224 Ark. 1053, 278 S.W.2d 96 (1955); *Alexander v. Johnson*, 182 Ark. 270, 31 S.W.2d 304 (1930); *Weber v. Weber*, 113 Ark. 471, 169 S.W. 318 (1914). In *Hardy v. Raines*, 228 Ark. 648, 310 S.W.2d 494 (1958), the court sustained an award of $65,000.00. The court will award plaintiffs Robert and Carey Miller $50,000.00 each on this claim but declines to award punitive damages.

■ Another of plaintiffs' claims can be briefly dealt with. Young Kody Miller was also publicly punished but his paddling was not nearly so severe as Justin's: He received ten swats. The court nevertheless believes that the public nature of this punishment makes it actionable and will award Kody Miller $1,000.00 in actual damages and $5,000.00 in punitive damages. There was testimony at the trial that at least part of the motive for Kody's paddling was to deter him from telling the authorities about the beatings being administered at Mr. Alamo's direction: The children had been admonished to refer to the punishments meted out as "spankings." Had these facts been pleaded the court would have awarded punitive damages in a much larger amount, for in that event the motive would have been admitted by the defendant. But on the present record it feels unable to make a larger award.

700

## IV.

Finally, plaintiffs allege numerous other acts which they characterize in Count V of their complaint as the intentional infliction of emotional injury. Among these acts were causing business documents to be executed under physical duress, publishing defamatory statements, slandering plaintiffs to their spouses, filing false criminal charges, breaking and entering plaintiffs' houses, hiding their children and spouses, and subjecting plaintiffs to humiliation and public ridicule. Included in these allegations also was the assertion that Mr. Alamo subjected the plaintiffs to a regimen including no time for sleep coupled "with an extremely poor diet and bizarre fasts" which left plaintiffs "confused, demoralized and unable to clearly think or reason," all this with a design to undermine and eventually to destroy "plaintiffs' self-respect, self-esteem and that concept of self and self-worth known by mental health professionals as 'ego.'" This harrowing list of abuses the defendant has chosen to admit by his default.

There can be no doubt that these acts are all actionable, and the court must face the difficulty of finding a number to compensate for this monstrous scheme of premeditated psychological injury. Because Carey Miller was subjected to the worst of these abuses, his recovery should be the highest. The court has consulted its trial notes to determine appropriate damages for each individual plaintiff, and awards them in the amounts indicated in the judgment.

## V.

A judgment consistent with this opinion will issue.