**SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, Plaintiff,**

v.

**TONY AND SUSAN ALAMO FOUNDATION, et al., Defendants.**

**Civ. No. 77–2183.**

United States District Court, W.D. Arkansas, Fort Smith Division.

Oct. 3, 1991.

Robert A. Fitz, U.S. Dept. of Labor, Dallas, Tex., for plaintiff.

Jeffrey A. Dickstein, Tulsa, Okl., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

### I. *Statement of the Case*

The issue before the court is whether the defendant, Tony Alamo, has met his burden of showing that he is not able to pay judgments for back wages in the total amount of $241,666.35 plus interest, obtained by the Secretary of Labor because of his failure and the failure of certain organizations that he controlled to pay minimum wage and overtime compensation to certain of his followers who were employed in various businesses controlled by him. A hearing was held on this issue on September 27, 1991.

Although the above accurately describes the status of this matter at the present time, it by no means adequately describes the checkered past that this case and associated cases have had in this court. According to the evidence, this all started in approximately the 1960's when Tony and his wife, Susan, started a ministry which involved witnessing to and preaching to people on the streets, apparently primarily in California. Subsequently, the headquarters of the "church" was moved to the Alma, Arkansas, area.

Over the years, the organization built numerous buildings on what is known as "Georgia Ridge" near Alma, including dormitories for followers who joined their organization and moved to that area. The organization grew, and apparently prospered, and it purchased or started a number of private businesses in the Alma area. Additionally, at some point, the group also started and operated what was apparently a popular retail clothing and accessories establishment, in Nashville, Tennessee, known as the Alamo of Nashville.

In 1977 this matter was filed by the Secretary of Labor contending that Susan and Tony Alamo, and various of the organizations controlled by them, were "employing" numerous persons to run the many business establishments operated by them and that they were violating the Fair Labor Standards Act by failing to keep the records required and by failing and refusing to pay their "employees" minimum wages and overtime pay. According to the file that developed in this case, after years of litigation, involving numerous discovery disputes, a judgment was entered on November 26, 1986, in the total amount of $182,996.14 and a second judgment was entered on May 30, 1989, in the total amount of $58,670.21. The defendants were enjoined and restrained from withholding payment of such amounts, and were given 14 days to pay the first judgment and ten days to pay the second. The matter was affirmed by the Court of Appeals. *Brock v. Tony and Susan Alamo Foundation, et al.,* 842 F.2d 1018 (8th Cir. 1988).

On August 21, 1989, the Secretary of Labor filed a motion to adjudge the defendants in civil contempt. A hearing was held by this court (with another judge presiding) on the motion. Tony Alamo did not appear. He was found in civil contempt and was required to purge himself of the contempt by paying the judgments. It was also ordered that he be committed to the custody of the U.S. Marshal to be confined until he purges himself of such contempt. A bench warrant was issued for his arrest.

Prior to the issuance of the federal bench warrant on October 31, 1989, Mr. Alamo was already a fugitive. The State of California had issued a warrant for his arrest on child abuse charges[1] on January 1, 1989, and a federal warrant was issued on June 20, 1989, for unlawful flight to avoid prosecution. This warrant was in connection with the California warrant. On July 9, 1991, the State of California reissued the arrest warrant on the child abuse charges, and raised the bond to $1,000,000.

At the hearing, defendant's counsel requested that the court take judicial notice

---

**1.** For a description of the actions which resulted in these charges, *see* the court's description in the case of *Miller v. Tony and Susan Alamo*

*Foundation,* 748 F.Supp. 695, 697 (W.D.Ark. 1990).

of the case of *Miller, et al. v. Tony and Susan Alamo Foundation, et al.*, No. 88–2206, filed on October 12, 1988. That was a case filed by former followers of Alamo and is described in *Miller, supra.* It was alleged in that lawsuit that Mr. Alamo and certain others under his direction were guilty of conduct which, if it occurred, could be described only as bizarre. Susan Alamo had died on April 8, 1982, and Tony Alamo failed to attend the trial, although other entities claimed to be controlled by him were represented by the attorney who also normally represented Mr. Alamo. After a trial, the court entered judgment in favor of the plaintiff in the total amount of $1,802,657.47. Among other things, the court found that "defendants Tony and Susan Alamo Foundation and Music Square Church, Inc. were entities which enjoyed no existence separate and apart from defendant Tony Alamo...." Order and Judgment filed April 19, 1990.

On January 28, 1991, a writ of execution on the aforementioned judgment was issued and on February 19, 1991, the district court's decision was affirmed by the Court of Appeals for the Eighth Circuit. 924 F.2d 143 (8th Cir.1991). Pursuant to the writ of execution, certain real and personal property belonging to Alamo and the various organizations that the district judge had found were controlled by him, located in and around Alma, Arkansas, and Nashville, Tennessee, were seized and sold at public auctions held from April 3, 1991 through April 16, 1991. Total proceeds from the sale of the real and personal property in addition to certain cash seized was $1,614,836.80.[2] Those amounts were apparently applied to the Miller judgment and numerous other judgments and liens, including multiple Internal Revenue Service liens for unpaid taxes.

Another piece of litigation, a criminal matter, should, perhaps, be described. On May 8, 1991, a grand jury for the Western District of Arkansas returned an indictment against Tony Alamo for allegedly threatening Judge Morris S. Arnold, the district judge who presided in the Miller case and the latter stages of the Fair Labor Standards case. On May 9, 1991, a warrant was issued for his arrest, and he remained a fugitive, not only in respect to this charge but in respect to the other charges delineated above, until he was arrested in Tampa, Florida on July 5, 1991, as a result of the efforts of a "task force" consisting of a number of individuals which was formed to find and arrest him. A trial was held in Fort Smith, Arkansas, and on September 12, 1991, the jury returned a verdict of acquittal. However, Mr. Alamo remains in custody because of the California warrants described above, and because of this court's finding of contempt in respect to his failure to pay the Fair Labor Standards Act judgment.

After the acquittal, Mr. Alamo, through his present attorney, who also represented him during the criminal matter, Jeffery Dickstein, on September 16, 1991, filed motions seeking to quash the bench warrant issued in respect to the Fair Labor Standards matter, and for his release. Of course, at least at present, Mr. Alamo would not be released even if that warrant was quashed and even if this court declined to hold him in contempt. That is true because of the other warrants requiring his detention described above.

Because of the circumstances of this case and because of Mr. Alamo's detention, this court set an immediate hearing which was held on September 23, 1991. Mr. Alamo testified in his own behalf, and called two witnesses. The Secretary of Labor called one witness, the federal marshal in charge of the task force which made the arrest. The Secretary took the position at the hearing that there was not sufficient time to adequately prepare for the hearing because it came so soon after the motion was filed. The Secretary asked for at least thirty days to conduct discovery and to prepare for the hearing.

**2.** Alamo testified at the September 27, 1991, hearing that the property had a value of at least $50,000,000.

At the conclusion of the testimony, the court asked for briefs from the attorneys for the parties. Those briefs have been received and the court is prepared to rule.

## II. *Discussion*

This court frankly has had a great deal of difficulty with this case because of its aversion to an abhorrence for holding individuals in jail even arguably for the purpose of requiring them to pay money judgments. The court is convinced that our founding fathers did not intend that we have "debtor's prisons". Not only is that constitutionally impermissible, but common sense should tell us that such measures should be used only in the most extreme circumstances. That is also the law. "Because the contempt power is a substantial one, it should be used sparingly and not lightly invoked". *Hartman v. Lyng,* 884 F.2d 1103, 1106 (8th Cir.1989).

Because of this court's reluctance to exercise this awesome power in this case, it declined to rule at the close of the hearing although it had a great deal of doubt that Mr. Alamo had met the burden imposed by the Fair Labor Standards Act as interpreted by the courts. Instead, it took the matter under advisement and directed that the attorneys for the parties brief certain issues. The Secretary of Labor was given thirty days to conduct discovery in an attempt to answer Mr. Alamo's contentions, and, among other things, the parties were asked to brief the question of whether Mr. Alamo could be and should be retained in custody during the thirty day period when such additional discovery was going forward.

█ After considering the briefs, and after a great deal of soul searching and consideration, the court has concluded, as it knew at the time the hearing concluded, that, because of its abhorrence for holding people in jail to enforce payment of debts, it was attempting to impose upon the Secretary of Labor a burden that the Fair Labor Standards Act, as consistently interpreted by the courts, does not impose.

What is indisputably the law is clearly and succinctly expressed in the Fifth Circuit case of *Hodgson v. Hotard,* 436 F.2d 1110, 1115 as follows:

> Once the Secretary has proved that an employer is delinquent in complying with a section 17 [29 U.S.C. § 217] order, he has established a *prima facie* case for civil contempt. The Secretary does not bear the burden of showing that the employer is able to comply with the earlier judgment. Instead, the employer must show that he cannot meet the demands of the court. The employer's burden is heavy. Indeed, it should be no lighter than that shouldered when an employer tries to prove that his business is exempt from the Act's minimum standards.... To successfully establish a defense, the employer must 'plainly and unmistakably' manifest the correctness of his cause.... This is particularly true when, as here, the defense—*i.e.,* financial inability to comply—rests on facts which are peculiarly within the defendant's own knowledge.

*Id.* at 1115. *See also* the Eighth Circuit cases of *Hodgson v. Taylor,* 439 F.2d 288 (8th Cir.1971) and *Hodgson v. A–1 Ambulance Service,* 455 F.2d 372 (8th Cir.1972).

Thus, it is this court's duty to apply the law as it exists and to determine from the evidence at the hearing whether Mr. Alamo has carried his heavy burden of showing "plainly and unmistakably" [3] that he is unable to pay the judgments. The court has concluded that he has simply not met that admittedly onerous burden.

The court recognizes that this hearing was held on very short notice and that there was little time for either side to properly prepare for it. As already indicated, that was done because of the incarceration of Mr. Alamo. The court believed that a speedy hearing was necessary even in spite of the apparent fact that he was to be held

---

3. The attorney for the Secretary has consistently said in their brief that the test is that the showing must be "plainly and *unmistakenly*" made. Neither the *Hotard* court, nor, as far as this court can determine, any other court, has ever stated that the showing must be "plainly and *unmistakenly*" made, probably because there is no such word as "unmistakenly".

on other charges irrespective of the court's conclusion in this case at least until bond arrangements or other arrangements could be made by him in respect to the other charges. At the hearing, the only evidence which could be considered to be probative of the issue before the court came from Mr. Alamo and two of his admitted followers or "church members".[4] For reasons to be discussed below, the court simply does not believe that this testimony shows "plainly and unmistakably" that Mr. Alamo and his various organizations are unable to pay the judgments rendered in this case.

Mr. Alamo claimed during his testimony that he had taken a vow of poverty many years ago when he was "saved" apparently in the mid–1960's. He claimed that he had "maybe $50" to his name and that he had not, over the years, ever acquired or possessed anything of value and had received no remuneration for his services rendered to "the church" and its "members". It was his apparent contention that his needs were taken care of by "church members".

That testimony flies in the face of his admission during the hearing that he had, over the years, been seen and photographed wearing expensive furs and jewelry and that he often, if not usually, traveled in a chauffeured limousine. His explanation for the expensive clothing was that they belong to the church and that he wore them "for promotional purposes" apparently to promote their sale through the various retail establishments run by the organization.

As to the trips in the chauffeured limousine, Mr. Alamo explained that it was necessary for him to do that because, when he traveled, he refused to stay in hotels and other public establishments because he "might catch Aids or something". He said that it was, thus, necessary for him to travel in this style so that he would be fresh and ready to work when he arrived at whatever location he was journeying to.

He also admitted that some of the business establishments had been successful, especially, the one that involved the design, manufacture, and sale of expensive shirts or jackets. He says that he designed these jackets at no cost to the church, and that the church members who were not employees but "volunteers" manufactured and sold the shirts or jackets for a price of from anywhere in the neighborhood of $250 to $350 up to $1,000 or $1,200 each. He said that he got nothing for these services other than for his "needs" provided by the church.

He admitted that, over the years, he had possessed for his own use numerous credit cards including cards for prestigious stores such as Sak's Fifth Avenue. However, he denied that these were used to finance a lavish lifestyle, but instead, claimed that they were used only for the purchase of items necessary for his necessities and that of his followers. He admitted that the bills generated by the use of these cards was paid, he assumed, by the church from church funds. He professed not to have much if any knowledge about the financial matters of the church, including how bills for expenses generated by him were paid.

When he was arrested in Tampa, Florida, he and his present wife were living in a residence which was rented for, he believed, $1,500 to $1,600 per month. He professed not to know who paid the rent for these apparently very adequate living quarters, but understood that they were paid for by "christians" who, in view of his poverty, had taken care of him for years, and were still doing so at the time of his arrest.

The evidence at the hearing showed that at the time of his arrest he and certain of his fellow church members were engaged in starting a restaurant in Tampa known as the "Wild Child" and a discount hardware store. He denied that he had anything to

---

**4.** Along with his brief, Mr. Alamo filed a motion seeking to supplement the record with a number of affidavits from Mr. Alamo's present wife and various other members of his church. These affidavits are conclusory in nature, and attempt to deal with both his ability to pay and the "Beatle's album". Because of the nature of these affidavits, and because they would be rank hearsay, the court declines to grant the motion to supplement because it believes that it would be improper to do so.

do with either of these business establishments other than to donate his expertise in the areas of business management. When he was arrested, the authorities found a plastic bag containing approximately $10,-000 in cash, but Mr. Alamo claimed that that did not belong to him but to his "christian friends", to be used in their business.

Certain of Mr. Alamo's testimony in relation to his activities in the recording and entertainment fields was both troubling and enlightening. After testifying that he could make millions in the entertainment industry if he had not forsaken all of that for a life of ministering to others, he described, during cross examination by the Secretary's attorney, a Beatle's album or recording that he claims to have had at one time in his possession. The attorney for the Secretary asked Mr. Alamo about a taped sermon that he had distributed, apparently on February 17, 1991, called Program 181, the "Beatitudes". In respect to that sermon, the following testimony ensued:

Q. In that tape did you represent that you owned a Beatles' album worth over $50,000,000,000.

A. Yes, but its not for sale. I've had it for 25 years.

Then, on redirect, his attorney said:

Q. I guess we ought to talk about the Beatles' album.

In response to that question, Mr. Alamo then gave a long and rambling answer purportedly describing that record or album. He says that, years ago, Pete Best, who claimed that he had been a drummer for the Beatles during their very early days when they were just starting out, was saved and asked him to manage his career. Best promised him certain rewards for his management and gave him a tape of an early Beatles performance made in Hamburg, Germany, in 1961. Apparently he also received, according to his testimony, other valuable recordings. In respect to the Beatles' album, he said that Best:

Said he had a Beatles' album he would give me for may services so I took it. I just threw it in a cardboard box and kept it and then I got saved and Susie told me never to put that Beatles' album out because a lot of people are going to say that you're in the ministry for money and she said you can always hold that Beatles' album up and say you are not in it for the money.

In respect to its value, he testified: "I've been told by people it is worth $50,000,000 and I don't know what it would be worth now. It is just a rare Beatles' album that was recorded in Hamburg, Germany, in 1961."

Mr. Alamo claimed that, because of his vow of poverty and because he only wished to provide services to others in his ministry, he had little interest in this valuable recording and apparently simply kept it in a box along with other possessions of the church on Georgia Ridge near Alma. Although his testimony, when this matter first came up during cross examination, seemed to indicate otherwise, he, during redirect, seemed to suddenly realize that, at least for purposes of this hearing, he should not have the album, and should not know where it is. He testified that that was the case. He said that he assumed that it was still on Georgia Ridge when the writ of execution was issued, and that he assumed from that that government authorities must now have it.

The court simply does not believe that the testimony of Mr. Alamo, summarized above, is believable, and it certainly does not show "plainly and unmistakably" that he cannot pay the judgment rendered in this case. The court cannot find "plainly and unmistakably" that he does not still have control of substantial assets. The evidence indicated that his needs at the time of his arrest were being taken care of by his "christian friends" and that "christian friends" were also paying his litigation expenses, including plane fares for witnesses who attended both the criminal trial and this hearing. The court believes that it is at least not unthinkable that "christian friends", which seem to take care of his every need, is merely a euphemism for a pot of money or a pool of assets that he has access to and control over located somewhere.

That possibility was certainly not removed by the two witnesses who testified for him, neither of whom could be considered by any stretch of the imagination to be unbiased. They were both devotees of Mr. Alamo. David Scheff, who journeyed from California at the expense of "christian friends" to testify at the hearing said that he had joined Tony Alamo's ministry in California over twenty years ago and had traveled with him and his organizations across the country. He had spent many years in the Alamo community on Georgia Ridge, and, for the last six or seven years before the writ of execution was served, had been a "volunteer" in the Alamo of Nashville store and had provided both services to that store and witnessed to its customers. He testified that he had witnessed for the church for many of those years on the streets of various places from California to Nashville. After the Alamo store was closed in Nashville, he returned to Los Angeles and witnessed on the streets for "the church" indicating to the court that it is not accurate to say, as Mr. Alamo does, that there is nothing left from which the judgment could be paid.

Although a great deal of the "jacket inventory" was apparently sold pursuant to the writ of execution on Georgia Ridge, it is apparent from the testimony that the "church members" have access to at least some inventory in some other location. It was disclosed during the hearing that, while he was being held in the Crawford County, Arkansas, detention facility, some of his "church members" inquired about whether he was being well-treated by the jailers. When he replied that he was, they gave to some of the jailers one or more of these, according to the testimony, valuable jackets.

Mr. Alamo's attorney contended at the close of the hearing that the court should find in his favor because the testimony of Mr. Alamo and his two followers was uncontroverted. That is, of course, not the law. In jury cases where the jury is the trier of fact it is common to give a jury instruction similar to the one contained at § 17.21 of Devitt and Blackmar, *Federal Jury Practice and Instructions*, Volume I, as follows:

> You are not required to accept testimony, even though the testimony is uncontradicted and the witness is not impeached. You may decide, because of the witnesses bearing and demeanor, or because the inherent improbability of his testimony, or for other reasons, sufficient to you, that such testimony is not worthy of belief.

*See also Smith v. C.I.R.*, 800 F.2d 930 (9th Cir.1986) and *Smith v. Paderick*, 519 F.2d 70 (4th Cir.1975). In *Smith*, the court held: "As the trial court is not compelled to accept even uncontroverted testimony when it doubts the credibility of a witness, (citing cases), the finding that the taxpayers did not meet their burden on the issue was not erroneous."

Because of Mr. Alamo's "bearing and demeanor" and "because of the inherent improbability of his testimony", the court simply does not believe him nor that of his other witnesses and must conclude that he has fallen woefully short of showing "plainly and unmistakably" that he cannot pay the judgment rendered in this case.

### III. *Conclusion*

Contemporaneously with the filing of this memorandum opinion, the court will enter an order adjudging Tony Alamo in civil contempt of this court for his failure to comply with the judgments of this court entered on November 26, 1986, and May 30, 1989. Mr. Alamo may purge himself of such contempt by paying the November 26, 1986, judgment plus interest at the rate of 5.77% per anum until paid, and the May 30, 1989, judgment plus interest at the rate of 9.15% per annum until paid, or by showing to this court, "clearly and unmistakably", that he is unable to make such payments.

In respect to the showing that the law requires Mr. Alamo to make in respect to his inability to pay the judgments, the court recognizes, as already indicated, that neither party in this case had sufficient time, prior to the September 27, 1991, hearing to properly prepare. Additionally, the court believes that great care should be taken in incarcerating someone for civil

contempt as in this case. For these reasons, the court will set this matter for an additional hearing *beginning at 8:30 a.m. Monday, November 4, 1991, in Fayetteville*, at which Mr. Alamo will be given an additional opportunity to make the showing in respect to his inability to pay as delineated above, and the Secretary of Labor will have an opportunity at that time to refute such contentions. The parties are ordered and directed to, during the period prior to the hearing, cooperate in conducting the discovery to properly prepare this matter for such hearing.

The court recognizes that Mr. Alamo's incarceration is a detriment to his raising the funds necessary to pay the judgments or in properly preparing for such hearing. Additionally, this court does not desire, by any means, to hold someone in jail improperly, and will, admittedly, "lean over backwards" to avoid that. For these reasons, and because the court, while convinced that Mr. Alamo has not met his burden of showing that he cannot pay the judgment, is also not totally convinced that he can. Of course, according to the law as this court understands it, the latter proposition is not required, since the Secretary's only burden is to show that the judgment remains unpaid. In any event, for these reasons, the court has concluded that it is appropriate for Mr. Alamo to be released from the incarceration caused by these contempt proceedings and for him, if he is able to obtain his release in respect to the other charges, to remain free during the period prior to the hearing set above.

In this respect, the Secretary argues, not without merit, that, if Mr. Alamo is allowed to go free, he will disappear into the mist and become a fugitive as he did for several years before his arrest. The Secretary argues that a performance bond in the amount of the total amount owed should be required as a condition to his release. On the other hand, Mr. Alamo urges that such a bond is improper in view of his contention that he cannot pay the judgment and, thus, also cannot make such a bond. He indicates, through his attorney, that any bond that could be made in this proceeding or in the other criminal proceedings would have to be made by the posting of money or property belonging to others, not Mr. Alamo.

The court believes that both contentions have merit and has concluded that the court should strive for an intermediate ground. The only legitimate concern that the Secretary of Labor should have in respect to his release is that some means be taken to attempt to insure that he will cooperate during the necessary discovery prior to the hearing and that he will be available at the hearing and after it so that he can be subjected to the orders of this court resulting from that hearing.

The court has concluded that, in the event that he is not held in respect to the other charges described above, he will be released from incarceration caused by these civil contempt proceedings upon the posting of a property, cash or other bond with sufficient sureties in the amount of $250,000 [5] to insure his cooperation in this matter and his availability at the hearing and after the court rules subsequent to it. Such bond will not be considered by the court to be a "performance bond" and no portion of it will be forfeited to the Secretary except upon the failure of Mr. Alamo to cooperate in these proceedings and to be available at and subsequent to the hearing so that he will be subject to the ruling of the court made in respect to it or, unless the Secretary is able to show the court that any cash or property posted belongs to or is under the control of Mr. Alamo. In other words, at the time the court rules after the hearing, if Mr. Alamo has not fled and is still subject to the court's jurisdiction, any cash or property posted to secure the bond shall be returned to those to

---

**5.** The court believes that Mr. Alamo can make a bond in this amount if he desires to do so. His attorney represented to this court during the hearing that if he was not held on the contempt charges, he would be able to make the bond on the California charges. Additionally, during a detention hearing in the criminal matter, Mr. Alamo offered to make a substantial bond and to additionally pay the expenses and costs of guards designated by the United States to guard him around the clock.

whom it belongs unless the Secretary of Labor is able to convince the court that it is, in fact, the property of Mr. Alamo or subject to his control, in which event, it may be subjected to attachment, garnishment, or other legal proceedings.