2010 Ark. App. 443

**Don THORNE, Appellant**

v.

**ARKANSAS DEPARTMENT OF
HUMAN SERVICES,**
**Appellee.**

**No. CA 09–583.**

Court of Appeals of Arkansas.

May 19, 2010.

Deborah R. Sallings, Arkansas Public Defender Commission, Little Rock, for appellant.

Tabitha B. McNulty, Office of Chief Counsel, Little Rock, Keith L. Chrestman, Chrestman Group, PLLC, Jonesboro, for appellee.

RITA W. GRUBER, Judge.

This court handed down an opinion on April 14, 2010, affirming the trial court's order adjudicating appellant Don Thorne's children dependent-neglected. The same day, we issued an opinion affirming the trial court's order adjudicating the children of Bethany Myers dependent-neglected, in part for the same reasons expressed in our decision affirming the order in Thorne's case. *Myers v. Arkansas Dep't of Human Servs.*, 2010 Ark. App. 326, 2010 WL 1487230. Thorne and Myers filed petitions for rehearing alleging that this court's decisions contained mistakes of law and fact. In response to Myers's petition, we issued a substituted opinion correcting a nonmaterial mistake of fact and denying her petition. *Myers v. Arkansas Dep't of Human Servs.,* 2010 Ark. App. 444, 2010 WL 1997411. We correct the same error in this substituted opinion and deny Thorne's petition.

This is one of four appeals decided today that involve children who were removed from the Tony Alamo Christian Ministries compound in Fouke, Arkansas, in November 2008. The circuit court heard the cases together in one adjudication hearing. Appellant, Don Thorne, is the father of three children placed in DHS's custody. He challenges the circuit court's order adjudicating them dependent-neglected. We affirm the court's order.

In September 2008, DHS took emergency custody of six minor females who lived in Tony Alamo's residence at the Fouke compound. DHS presented evidence that their parents were aware of beatings administered to the ministry's children by adults; that some of the parents and other children witnessed the beatings; that the parents condoned the marriage of underage females to adult males and placed their daughters in the residence of Tony Alamo without parental supervision; that Alamo sexually abused one of the girls (M.B.1) and spent time in his bedroom with others; that the parents neglected to provide the children with proper medical care and education; and that they condoned extreme disciplinary measures for young children, such as fasting. On November 18, 2009, we affirmed the circuit courts orders adjudicating the girls dependent-neglected. *See Broderick v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 771, 358 S.W.3d 909; *Seago v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 767, 360 S.W.3d 733; *Reid v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 784, 2009 WL 3855700.

The evidence taken at the girls' adjudication hearings led DHS to seek emergency custody of many more children in Fouke. The circuit court held an adjudication hearing that began on January 12, 2009, for the Reid, Seago, Broderick, Ondrisek, Krantz, Thorne, Myers, Parrish, and Avila children. Many of the children sought by DHS, including some of the Thorne and Myers children, were hidden by their parents or other ministry adults. The court granted DHS's motion for directed verdict as to the Reid, Seago, Broderick, and Ondrisek children because their siblings had already been adjudicated dependent-neglected. On February 17, 2010, we affirmed appeals from those adjudications because the appellants had raised their arguments for the first time on appeal. Today we affirm the orders adjudicating the children of the Thorne, Krantz, Myers, and Parrish families dependent-neglected.

Don Thorne is the father of a daughter, A.T.1, aged fourteen, and two sons, A.T.2, born in 1995, and A.T.3, aged twelve. From an earlier marriage, he is also the father of one of the other appellants, Sophia Parrish, aged twenty-three. He has been a member of the ministry since 1974, when he was nineteen. There was testimony that A.T.1 lived in Tony Alamo's residence. Thorne works for the ministry and lives on its property in Fouke. At the time of the hearing, his wife, Luisa Cordero–Thorne, was in hiding with A.T.1 and A.T.3 with Thorne's help. Although Thorne claimed to not know where they were, the circuit court held him in contempt until his wife brought the children back.

The witnesses at the adjudication hearing were G.P.1 (the son of Carlos and Sophia Parish); Jessica Cooper (a former member of the ministry); M.B.1 (a former member); Nicholas Broderick (a former member); S.B. (a former member); H.D. (a former member); Don Thorne; Sophia Parrish; Carlos Parrish; Bert Krantz; Debra Ondrisek; Miriam Krantz; Richard Ondrisek; Cindy Allen (a DHS supervisor); Brian Broderick; Alphonso Reid; Bethany Myers; Rebecca Avila; and Jose

Avila. Nicholas, M.B.1, and S.B. are siblings of M.B.2, who was a subject of this hearing. Jessica Cooper is their aunt. Like Thorne, the Krantzes, the Parrishes, Bethany Myers, the Ondriseks, the Avilas, Brian Broderick, and Alphonso Reid are parents of some of the children with whom this hearing was concerned.

Jessica Cooper testified that she was born in the ministry in 1972 and married her husband when she was sixteen and he was twenty-seven. She said that the ministry is not a safe environment in which to rear children and testified at length about its communal lifestyle; its secrecy; the reporting system that encourages members to inform on each others' transgressions; the imposition of fasting as punishment; and the restrictions on members' contact with the outside world. She said that she left because she wanted her children to go to college and that it was not customary for girls to finish high school because they usually got married. She gave several examples of girls no older than sixteen who married grown men. She stated that, in the past, Tony Alamo had run the organization from prison; that he encouraged parents to give up their parental authority to him; that the parents adopted Alamo's views and were blind to the risks to their children; and that children were often separated from their parents, as she was at the age of twelve. She described being in a group of children present when Justin Miller was given 140 licks with a three-feet-long paddle at Alamo's direction; when it was over, blood seeped through his pants.[1] She said that Alamo had spanked her with a board and had beaten others mercilessly, and she named numerous people whom she had seen beaten. Ms. Cooper said that, before she left the ministry, her son confided to her that he was thinking about suicide.

S.B. described being beaten at Alamo's direction by one of his wives, Michelle Jones, when S.B. and her sisters M.B.1 and A.B. were living at Alamo's residence. She said that A.T.1 (Thorne's daughter) and L.K. (one of the Krantzes' daughters) were in the room during her beating. She also said that A.T.1 lived in Alamo's home, which L.K. visited. She stated that Alamo had slapped her four or five times and that he had hit B.S. (Greg Seago's daughter), C.R. (Alphonso Reid's daughter, aged ten), and A.O. (the Ondriseks' daughter). She also said that some girls were forced to fast. S.B. said that she was threatened with a spanking by John Kolbeck if she told anyone what happened at Alamo's house. She testified that, in February or March 2008, she and the other girls at Alamo's house, including A.T.1 and M.M., were forced by Alamo to participate in recording Tape No. 564, in which they denied being molested by him.

In detail, M.B.1 described the ministry's secrecy and the members' isolation from the outside world; Alamo's teaching that the Bible permitted girls to marry at puberty; her sexual molestation in the shower by Alamo when she was living in his home; her beating by John Kolbeck; Kolbeck's beating of other children; Alamo's living arrangements with adult women and girls as young as age eight; his time spent alone in his bedroom with the young girls; her participation in Tape 564 with N.M.1 and M.M.; and being forced to help hold down S.B. (aged eleven or twelve) while Michelle Jones beat her. M.B.1 said that she heard B.S. scream while John Kolbeck beat her and that Bethany Myers was one of the people who dragged B.S. to the beating. According to M.B.1, Myers's daughters N.M.1 and M.M., while living in a separate residence

---

1. *See Miller v. Tony & Susan Alamo Found.,* 748 F.Supp. 695 (W.D.Ark.1990).

with Myers, spent a significant amount of time in Alamo's household. M.B.1 also said that two men in their twenties had asked her to marry them and that she had friends her age who had already married and had children and who hated their lives. She stated that most older boys leave the ministry; that it is not safe for children; and that Alamo would continue to control the ministry while he was in jail. She said that the parents believe that Alamo is a prophet and do not question his authority.

Nicholas Broderick described witnessing John Kolbeck's savage beating of Spencer Ondrisek, Phillip Avila, and A.O., while the Ondriseks were present and did nothing. He said that Kolbeck once slapped him, but did not beat him, because Nicholas stated that he was going to leave the ministry. He explained that it was normal for boys to drop out of school by the age of seventeen and that there were few boys in school above the tenth grade, after which he dropped out. He said that he was forced to fast a few times and experienced "diesel therapy" (being forced to ride with a driver of a ministry truck). He added that young girls were at risk of becoming child brides; that J.G. married a man in his thirties; and that R.S. married when she was fourteen.

H.D., aged seventeen, testified that she had left the ministry when she was twelve. She said that she was forced to fast for a week at the age of ten because she had failed to perform a chore after suffering a head injury in a fall. She stated that the fall caused her to lose consciousness, and when she came to, people were praying over her; no one, however, took her to a doctor. In fact, she did not think that ministry members were supposed to go to the hospital. She said that she had suffered memory loss and pain and swelling on the back of her head. She said that her sister had also been placed on a fast. H.D. described being present when J.G. was informed that she was going to get married at the age of twelve. She said that she and J.G. were playing with Barbies when J.G.'s mother received a phone call in which she learned that the marriage would occur; J.G. and her mother were upset, and J.G. cried. She said that J.G. had a typical wedding with a bridal dress and bridesmaids.[2] H.D. stated that she was taught that it was permissible to lie to people outside the ministry.

Bethany Myers acknowledged violating the court's order by not producing her children for DHS. She said that she had no idea where her husband and children were. The trial court held her in contempt and placed her in jail.

Don Thorne denied having any first-hand knowledge that John Kolbeck or anyone else had beaten the children or that children had been forced to fast. He admitted giving Sophia away in marriage at the age of twelve. He claimed that the ministry no longer permitted young girls to marry but admitted that he had heard Alamo preach that the Bible condones polygamy and the marriage of girls at puberty. Thorne denied letting A.T.1 live at Alamo's residence but admitted that she had stayed there for a couple of weeks. He was untroubled by Alamo's using her to create Tape No. 564 without his permission. He acknowledged that his wife had told him that she had asked John Kolbeck to spank A.T.2 while Thorne was driving a truck for the ministry.

G.P.1, aged seven, testified that his father had spanked him and two of his younger sisters with a paddle that had their names on it. He said that both of his parents had slapped him on the face when

2. A wedding picture from J.G.'s wedding ceremony was introduced into evidence.

he was six, leaving red marks, and that he was afraid of being spanked by John Kolbeck.

Sophia Parrish admitted slapping and "popping" G.P.1 in the mouth on two occasions but denied leaving any marks. She admitted spanking him and G.P.2 with a paint stirrer or with her hand. After obviously lying under oath and being threatened with a perjury charge, Sophia returned to the stand and admitted that she had spanked G.P.1 with a paddle; that she had married at twelve when Carlos was nineteen; that her father had walked her down the aisle; that she had sex with Carlos when she was twelve; and that she had given birth to a stillborn baby girl at the age of fourteen. Sophia stated that the Krantzes were at her wedding, which was widely celebrated by the members of the ministry. She affirmed that John Kolbeck had spanked A.T.2 at his mother's request. Sophia said that she had completed only the sixth grade because she had not wanted to be pregnant while in school. She stated that her friends had also dropped out when they began having children, and she listed four other weddings of young girls that she had attended.

Carlos Parrish testified that he did not believe Nicholas and denied having witnessed any beatings. He stated that he had no intention of moving away from the ministry's property.

Bert Krantz, who was fifty-seven years old at the time of the hearing, testified that he joined the ministry, in which he is a minister, in 1972, and that he works in disseminating Alamo's recorded messages. He admitted that he was present at, and approved of, several weddings of young girls but said that the ministry had not permitted underage girls to marry in five or six years. He stated that, although the Bible condones the marriage of young girls at puberty, he would not permit his children to marry during their minority, nor would he let his children fast or be disciplined by anyone else. He stated that he had never witnessed any physical punishment. He acknowledged having heard Tape No. 564 but said that it had not concerned him. Bert said that he believed that Alamo is a prophet and that it would be a sin against God to leave the ministry. He denied letting Alamo run anything in his life, but he admitted that he does not drive because Alamo does not want him to do so.

Miriam Krantz, who is twenty years younger than her husband and is the custodian of the audiotapes, also said that no one else disciplined her children; that she was familiar with Tape No. 564; that she also believes that Alamo is a prophet; that she did not know that Kolbeck had administered discipline; and that, when she attended Sophia's wedding, she was aware that Sophia was twelve, but it did not concern her.

In the adjudication order, the circuit court found the children dependent-neglected and made extensive findings of fact. The court found that the Thornes had failed to protect their children against physical abuse; that they were aware of the pattern and practice of severe physical beatings; that they endorsed and facilitated illegal marriages of underage females to adult males; that they neglected the needs of their children by failing to assure that they received adequate education and by failing to register their children in an accredited school with certified teachers or providing legally approved home schooling. The court also found that the parents committed or permitted medical and physical abuse by requiring, condoning, and permitting dangerous, involuntary fasts imposed on children younger than fifteen, and by failing to have them properly immunized. The court further found that the parents

were aware of multiple instances when Tony Alamo, through his direction to John Kolbeck or others, intentionally caused physical harm to Spencer Ondrisek, Philip Avila, and A.O. The court found that the parents were aware of Alamo's pattern and practice of enforcing adherence to his will by brutal physical attacks. The court noted M.B.1's molestation by Alamo at the age of thirteen. It further found that the parents were aware that Alamo claimed to be married to multiple wives and that they permitted and condoned the ministry's practice of "diesel therapy."

The court set the goal of reunification and gave the parents supervised visitation. Along with other requirements, it directed them to obtain stable employment and safe and stable housing, separate and apart from the Tony Alamo Christian Ministries and its members, and to maintain them for at least six months. The court directed Thorne to assist DHS in locating the children currently in hiding with his spouse. The court expressly found the testimony of M.B., Jessica Cooper, S.B., H.D., and Nicholas Broderick that beatings, forced fasting, underage marriages, educational neglect, and sexual abuse occurred credible and stated that there was a pattern and practice of such abuse. It deemed not credible the testimony of Carlos Parrish, Sophia Parrish, Thorne, Bert Krantz, and Miriam Krantz that those abuses did not occur.

Thorne first challenges the evidence supporting the adjudication of his children as dependent-neglected and contends that there was no evidence that they were mistreated in any way. He points out that there was no evidence that they were not immunized; although this is correct, it does not require reversal, in view of the overwhelming evidence of other threats to their well-being, which are discussed below. Thorne also asserts that the evidence

does not support the trial court's findings that he had educationally neglected his children, pointing out, correctly, that the Christian A Beka curriculum used by the ministry's school is widely accepted, and that the state does not require private schools to be accredited or that their teachers be certified. Nevertheless, the evidence demonstrated that young girls frequently drop out of school long before completing high school and that the boys, who often are placed on diesel therapy, do not progress much further. In the ministry, getting a high school diploma is the exception, not the rule.

Thorne also asserts that the trial court did not judge his case separately from the others and thereby contravened Arkansas Code Annotated section 9–27–325(i)(1) (Repl.2009), which requires adjudication hearings to be closed. We disagree. First, the trial court did close the hearing. Second, although the trial court's adjudication orders used similar language, it was apparent that the court considered each case on its own. Third, that statute does not prevent the circuit court from hearing certain cases together when it is appropriate, and appellants have cited no authority to the contrary.

Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Ark. Code Ann. § 9–27–327(a)(1) (Repl.2009). Dependency-neglect allegations must be proven by a preponderance of the evidence. Ark.Code Ann. § 9–27–325(h)(2)(B) (Repl.2009). We will not reverse the circuit court's findings unless they are clearly erroneous. *Seago v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 767, 360 S.W.3d 733. In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. *Id.* The focus of an adjudication hearing is on the child, not

the parent; at this stage of a proceeding, the juvenile code is concerned with whether the child is dependent-neglected. *Id.* An adjudication of dependency-neglect occurs without reference to which parent committed the acts or omissions leading to the adjudication; the juvenile is simply dependent-neglected. *Id.; Albright v. Ark. Dep't of Human Servs.*, 97 Ark. App. 277, 248 S.W.3d 498 (2007).

Arkansas Code Annotated section 9–27–303(18)(A) (Repl.2009) defines a "dependent-neglected juvenile" as any juvenile who is at substantial risk of serious harm as a result of abandonment, abuse, sexual abuse, sexual exploitation, or neglect. The definition of "neglect" in section 9–27–303(36)(A) includes acts or omissions of "a parent, guardian, custodian, foster parent, or any person who is entrusted with the juvenile's care by a parent" that constitute:

(i) Failure or refusal to prevent the abuse of the juvenile when the person knows or has reasonable cause to know the juvenile is or has been abused;

(ii) Failure or refusal to provide the necessary food, clothing, shelter, and education required by law, . . . or medical treatment necessary for the juvenile's well-being . . .;

(iii) Failure to take reasonable action to protect the juvenile from abandonment, abuse, sexual abuse, sexual exploitation, neglect, or parental unfitness when the existence of this condition was known or should have been known;

(iv) Failure or irremediable inability to provide for the essential and necessary physical, mental, or emotional needs of the juvenile, including failure to provide a shelter that does not pose a risk to the health or safety of the juvenile;

(v) Failure to provide for the juvenile's care and maintenance, proper or necessary support, or medical, surgical, or other necessary care;

(vi) Failure, although able, to assume responsibility for the care and custody of the juvenile or to participate in a plan to assume the responsibility; or

(vii) Failure to appropriately supervise the juvenile that results in the juvenile's being left alone at an inappropriate age or in inappropriate circumstances, creating a dangerous situation or a situation that puts the juvenile at risk of harm.

We reject Thorne's argument that the circuit court erred in finding his children dependent-neglected because there was no evidence that they had personally suffered abuse. As we explained in our November 2009 *Seago, Broderick,* and *Reid* opinions, the General Assembly's expressed purpose in the juvenile code is to protect dependent-neglected children and make their health and safety its paramount concern; a child may be adjudicated dependent-neglected even if he or she has not yet suffered abuse. Thorne, who lived and worked in this community for over three decades, was rearing his children in a secretive, communal environment that included sexual abuse of young girls, underage marriage, fasting, and beatings. Thorne admitted that his wife asked John Kolbeck to spank A.T.2 while he was absent and that he gave his twelve-year-old daughter in marriage to an adult man. A.T.1, who apparently lived in Alamo's home, witnessed S.B.'s beating by Michelle Jones. Bethany Myers was one of the people who dragged B.S. to be beaten by Kolbeck. Additionally, Sophia Parrish admitted "popping" G.P.1 on the mouth, as he had testified. Striking a child six years of age or younger on the face or head, with or without physical injury, is abuse. Ark. Code Ann. § 9–27–303(3)(A)(vii)(a). Thorne's assertion that the evidence of corporal punishment should not be credited because there was no medical evidence is disingenuous in view of the testimony

showing that the ministry discourages its members from seeking medical assistance.

■ Thorne's second argument is that two provisions of the case plan violate his right to freely exercise his religion as protected by the United States and Arkansas Constitutions. The ₁₅circuit court ordered Thorne to "obtain safe and stable housing separate and apart from the Tony Alamo Christian Ministries and its members, and maintain said housing for at least six months" and to "obtain stable employment separate and apart from the Tony Alamo Christian Ministries and its members and maintain said employment for at least six months." Thorne contends that, in essence, the case plan makes him choose between his children and his church.

■ DHS and the attorney ad litem argue that Thorne failed to make this argument below and that the circuit court therefore never ruled on it. We disagree. Thorne's lawyer raised the constitutional issue at the beginning of the hearing: "Your Honor, this case is purely a free exercise of religion case." Thorne and other witnesses testified about the importance of communal living within the ministry. When asked whether living off ministry property would have an effect on his "Christian walk," Thorne responded "[a]bsolutely." The circuit court, in ruling from the bench on the dependency-neglect issues, recognized Thorne's beliefs. "[T]he parents involved have very strong feelings and very strong convictions concerning their spiritual beliefs and how they wish to live." And the court recognized the legal decision it faced.

> [W]e have the intertwining of the allegations of the state concerning abuse in various forms and various forms of neglect coupled with the religious and spiritual beliefs of the mothers and fathers and families that are participants in this case. That right, as given to us as

citizens of the United States, that is freedom of religion to believe as we cho[o]se I consider to be one of our most important rights and one that I, as a judge, believe that I am charged to protect within the law as within the facts.

The circuit court's order, finally, required Thorne to make substantial changes in his religious practices to pursue reunification with his children. Taking this record as a whole, we conclude that Thorne preserved the constitutional argument.

■ Every person's right to make decisions of conscience about religious matters is protected by the Free Exercise Clause of the First Amendment to the United States Constitution and by an even more sweeping provision of the Arkansas Constitution. Article 2, section 24 of Arkansas's Constitution provides, in part, that "[a]ll men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences.... No human authority can, in any case or manner whatsoever, control or interfere with the right of conscience...." As another court stated the legal principle in another case involving this ministry, "[r]eligious and political beliefs, no matter how bizarre and nonconforming, are personal matters, and the courts are not instruments of orthodoxy charged with the responsibility of keeping citizens on the ideological straight and narrow." *Miller v. Tony and Susan Alamo Found.*, 748 F.Supp. 695, 698 (W.D.Ark.1990) (Morris S. Arnold, J.); *see also West Virginia State Board of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). To judge the constitutional issue fairly, therefore, we must acknowledge and consider the circuit court's unchallenged finding about the sincerity of Thorne's religious beliefs. We do.

A parent's right of conscience in religious matters, however, sometimes collides with state laws of general application promulgated for the protection of children and other citizens. There are familiar examples. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (a state may not compel Amish children to attend high school until age 16); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (a child-labor law was constitutional even though it kept a child from selling religious tracts as part of her faith); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (a state may not require students to attend public schools; a parent has the authority to provide, and his or her child has the right to receive, sectarian schooling with secular schooling). These fact-specific cases strive for a delicate balance, one that respects all the important interests involved: parents' rights of conscience and of child-rearing and the state's interest as *parens patriae* in protecting children.

Arkansas law recognizes this delicate balance. "Parents, of course, have a fundamental right to direct the care and upbringing of their children. But the State of Arkansas has an equally compelling interest in the protection of its children." *Porter v. Ark. Dep't of Health & Human Servs.*, 374 Ark. 177, 185, 286 S.W.3d 686, 693 (2008) (internal citations omitted); *see also* Ark.Code Ann. § 9–27–102 (Repl.2009). And in child custody disputes, for example, a parent's religiously motivated choices and actions are material if they affect a child's well being. *Hicks v. Cook*, 103 Ark. App. 207, 212, 288 S.W.3d 244, 248 (2008). In some cases, the facts tip the balance in favor of protecting the child, and against the parent's liberty— even in matters of conscience and religious conviction. *E.g., Prince*, 321 U.S. at 167, 64 S.Ct. 438.

This is one of those cases. As the circuit court found, the most pressing potential danger facing Thorne's children was simply living on ministry property. The record is full of testimony about beatings, sexual abuse, underage marriages, and other problems, all of which victimized the children of families living on ministry property. In fashioning its case plan, the circuit court responded to the potential danger with a narrowly tailored solution— requiring Thorne to obtain housing separate and apart from the ministry. And because ministry life was communal in almost every respect, the court also required Thorne to obtain employment outside the ministry so he could earn the money to pay for this new housing arrangement and other living expenses. Here, as the circuit court implicitly concluded, the State's interest in preventing potential harm to these children outweighed Thorne's conscientious choice to live on ministry property, work for the ministry, and depend on the ministry for his family's every need. We see no constitutional infirmity in the circuit court's disposition order on this record. We therefore affirm on Thorne's second point.

Affirmed.

GLADWIN, KINARD, GLOVER, BAKER, and BROWN, JJ., agree.