2011 Ark. 182

**Bethany MYERS, Appellant,**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
Appellee.

No. 10–692.

Supreme Court of Arkansas.

April 28, 2011.

John Wesley Hall, Little Rock, for appellant.

Elisabeth McGee, Office of Chief Counsel, Little Rock, and Chrestman Group, PLLC, by: Keith L. Chrestman, for appellees.

JIM GUNTER, Justice.

This is one of five appeals decided today that involve children who were removed from the Tony Alamo Christian Ministries (TACM) compound in Fouke,

Arkansas, in September and November of 2008. In each case, the appellants are parents who have had their rights terminated as to some or all of their children.[1] In this appeal, appellant Bethany Myers, whose parental rights to two of her sons were terminated, argues (1) that the case plan requirements unduly burdened her constitutional right to free exercise of religion; (2) that the circuit court erred by allowing the introduction of certain taped conversations between Tony Alamo and members of his ministry; and (3) that the circuit court erred by finding there was sufficient evidence to support the termination of her parental rights. We assumed this case because it contains an issue involving the Arkansas Constitution; therefore, this court has jurisdiction pursuant to Arkansas Supreme Court Rule 1–2(a)(1). We affirm the circuit court.

On October 20, 2008, a joint raid was conducted by the Federal Bureau of Investigation and the Arkansas State Police on the TACM compound. As a result, six juveniles were taken into foster care. Based on information obtained from those juveniles concerning the physical abuse and neglect of children whose parents or guardians are members of TACM, an emergency custody order was entered on November 18, 2008, for numerous children living at the compound, including appellant's six children, ages four through fourteen. The next day, November 19, an amended petition for emergency custody and dependency-neglect was filed. This petition alleged that the juveniles were dependent-neglected as defined by Ark. Code Ann. § 9–27–303(18) and that removal from parental or custodial care was necessary to protect the health or physical well-being of the juveniles from immediate danger. On December 22, 2008, a probable cause order was entered, finding that the emergency conditions that necessitated the removal of the juveniles continued and that custody would remain with the Department of Human Services (DHS).

On February 27, 2009, the court entered an adjudication order finding that the juveniles, including appellant's children, were dependent-neglected. Specifically, the court found that the parents of these children failed to protect their children against physical abuse; endorsed and facilitated attempted illegal marriages of underage females to adult males; failed to reasonably assure that the children receive adequate educations; and failed to have the children properly immunized. The court found that return to the custody of the parents was contrary to the welfare of the juveniles and ordered that DHS continue to have custody of the juveniles. The court set the goal of the case as reunification and ordered the parents, including appellant, to: (1) submit to psychological evaluations; (2) attend and actively participate in counseling; (3) successfully complete parenting classes; (4) obtain safe and stable housing separate and apart from TACM; (5) obtain stable employment separate and apart from TACM. Appellant was also ordered to assist DHS in locating her three daughters, who were in hiding with her husband, Jim Myers.

A review order regarding appellant's case was entered on July 19, 2009. In that order, the court found that the case plan was not moving toward an appropriate permanency plan for the children, but the goal of the case continued to be reunification. The court found that appellant had

1. *See Parrish v. Ark. Dep't of Human Servs.*, 2011 WL 1631123; *Seago v. Ark. Dep't of Human Servs.*, 2011 Ark. 184, 380 S.W.3d 894 (2011); *Krantz v. Ark. Dep't of Human Servs.*, 2011 Ark. 185, 380 S.W.3d 927 (2011); and *Reid v. Ark. Dep't of Human Servs.*, 2011 Ark. 187, 380 S.W.3d 918 (2011).

complied with the case plan by completing parenting classes and obtaining a psychological evaluation, but she had not complied with the order to disclose the location of her husband and daughters. Appellant was again ordered to obtain housing and employment separate and apart from TACM.

On December 8, 2009, a permanency planning order was entered that changed the goal of appellant's case to termination of parental rights and adoption with respect to appellant's three sons. The court found again that appellant had partially complied with the case plan by completing parenting classes and obtaining a psychological examination, but that appellant adamantly refused to seek independent housing or employment or to disclose the whereabouts of her three daughters. The court found that appellant and her husband, Jim Myers, had exposed their children to an atmosphere with serious risk of child abuse; were totally dependent upon TACM, which was controlled by a convicted sex offender; and refused to believe that child abuse occurred within the organization at the direction of Tony Alamo.

A petition for termination of parental rights was filed with the court on December 17, 2009. In the petition, DHS sought termination of parental rights and the authority to consent to permanent alternate placement and adoption for appellant's three sons. The petition also noted that the parents continued to refuse to disclose the location of their three daughters. Appellant filed an answer to the petition for termination of parental rights on January 4, 2010, and alleged that there had been a substantial change of circumstances, namely Tony Alamo's imprisonment, that eliminated or negated the reason for the dependency adjudication; that a healthy and productive family environment for the chil-

dren had been restored; and that the children were no longer in danger of abuse or neglect.

On January 14, 2010, appellant filed a motion to eliminate two requirements from the case plan, specifically the requirements that she seek housing and employment separate and apart from TACM. According to appellant, these requirements interfered with her constitutional right to practice the religion of her choice and violated the First Amendment of the United States Constitution, the substantive due-process provisions of the Fourteenth Amendment of the United States Constitution, and article 2, section 24 of the Arkansas Constitution. DHS responded and argued that the right to practice religion freely did not include the liberty to endanger or physically harm one's children.

A termination hearing on appellant's case, as well as the four other cases that are now on appeal, was held on January 27, 2010. Salisa Templeton, an employee of the Bowie County Correctional Center in Texarkana, testified that Bernie Lazaar Hoffman, also known as Tony Alamo, was recently an inmate at the facility and that recordings of his phone calls had been made. When DHS attempted to introduce a CD of the recordings, appellant objected and argued that it was inadmissible hearsay and more prejudicial than probative. DHS, on the other hand, argued that the phone calls fell under the business-records exception to hearsay. The court agreed with DHS and also found that the probative value outweighed any prejudice.

The motion to eliminate the two requirements from the case plan was then discussed, and appellant stipulated that the Arkansas Court of Appeals had already decided that there was a compelling state interest to justify an initial finding of de-

pendency-neglect.[2] Appellant argued, however, that there was now a change of circumstances, specifically the imprisonment of Alamo, that rendered the two provisions regarding separate housing and employment unnecessary. Appellant also asserted that, due to these changed circumstances, there were less intrusive methods available to protect the interest and welfare of the children. Appellant argued that the current case plan infringed on her constitutional right to practice religion freely and that the threat that initially caused the children to be removed had been effectively neutralized.

DHS responded by arguing that, even assuming appellant held a legitimate religious belief and that belief was burdened by a state action, the state had a compelling interest in protecting children that justified any burden placed on appellant's religious practices. DHS disagreed that the removal of Tony Alamo from the situation changed the circumstances in any significant way. The court ruled that appellant did have a legitimate religious belief and that the state had a compelling interest, but declined to answer whether the religious freedom of appellant was unduly burdened by the state. Instead, the court stated that it would make that ruling after hearing further testimony.

Malynda Cree, the Court–Appointed Special Advocate (CASA) program director in Texarkana, testified that she was familiar with the cases involving the children taken from TACM, including the Myers children. She testified that she acted as the supervisor for the volunteers that were appointed to the case and also worked as an advocate for the children if a volunteer was no longer available. She testified that she had listened to a large number of the phone calls between Tony Alamo and the women at the compound, and based on those phone conversations, she stated that she had great concerns about whether his control over the ministry had really changed. In her opinion, Tony Alamo was still in charge of the ministry. Several excerpts of conversations between Alamo and various women at the compound were then played for the court. Cree also testified that she had no doubt that there was potential harm to the children if they were returned to their parents because the same person, Tony Alamo, continued to control of the ministry. She explained that the parents are dependent upon the ministry for their everyday basic needs, and she did not believe the parents would be able to go against whatever Alamo told them to do. She testified that none of the parents had taken steps to rectify the conditions that caused the removal and that none of the parents had a reliable means of supporting their children independent of the ministry.

James Syler, an employee of the Office of Child Support Enforcement, testified as to the status of the child support payments for each parent. With respect to appellant, Syler testified that there was a support balance of $333.60 owed as of January 19, 2010.

The court next heard testimony as it pertained to each parents' individual case.[3] After hearing all testimony and closing

---

2. This is a reference to three opinions from the court of appeals, issued on November 18, 2009, affirming the circuit court's adjudication that several other children taken from the TACM compound were dependent-neglected. *See Seago v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 767, 360 S.W.3d 733; *Broderick v.* *Ark. Dep't of Human Servs.*, 2009 Ark. App. 771, 358 S.W.3d 909; *Reid v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 784, 2009 WL 3855700.

3. The specific testimony relevant to appellant's case will be discussed in Point III, *infra*.

arguments from counsel, the court found that the protection of the children of the State of Arkansas was a compelling state interest, and that the parents had a right to exercise their freedom of religion, but that the burden placed upon the parents' religious freedom did not override the compelling state interest. The court found that, pursuant to its compelling interest, the state had a right to impose the separate housing and employment requirements as part of the case plan. An order terminating appellant's rights to her two younger sons, E.M. and N.M., was entered on April 16, 2010. Appellant filed a notice of appeal from this order on May 4, 2010.[4]

## I. Free Exercise of Religion

In her first point on appeal, appellant argues that this case should be reviewed under a strict-scrutiny standard, as it concerns a violation of her right to free exercise of religion and due process. Appellant asserts that the previous court of appeals cases that have affirmed the adjudications of dependency-neglect erroneously employed a "mere balancing of interests" instead of the required strict-scrutiny standard. Appellant urges that, under the correct strict-scrutiny standard, she should have prevailed below and that her children should have been returned to her.

Appellant insists that her children were not at serious risk, even taking into consideration all the testimony presented. Instead, her children were "lumped in" with all the other children at TACM without any individual assessment regarding her own children and her own constitutional claims. According to appellant, the juve-nile court told her to "stop" serving God without offering any alternatives and, when she did not, her parental rights were terminated. Appellant insists that "[w]hile there may have been some evidence supporting a dependency and neglect finding as to other parents and children at the church property, including child abuse and some sexual abuse," none of the evidence involved appellant's children in particular.

Appellant states that her parental rights were terminated based on her belief system and the church she wants to attend, and that the court did not even consider other alternatives. However, according to appellant, "a far more sensitive First Amendment and Fourteenth Amendment and state constitutional analysis was required." Appellant concludes by arguing that there is no compelling state interest to justify "depopulating the Tony Alamo Christian Ministries of all family units," nor is there any state interest in "forbidding the Appellant from continuing to live as a missionary in order to maintain custody of her children."

In response, DHS first asserts that the court of appeals's decision in *Thorne v. Arkansas Department of Human Services,* 2010 Ark. App. 443, 374 S.W.3d 912, should be law of the case on this constitutional issue. In *Thorne,* the court of appeals held, with respect to several other parents, that the requirements of separate housing and employment apart from the TACM was a narrowly tailored solution to the potential danger of living on ministry property and depending on the ministry for all basic needs, and thus presented no constitutional infirmity.

4. Note that on May 19, 2010, the court of appeals issued a substituted opinion in which it affirmed the order adjudicating appellant's children dependent-neglected. *See Myers v. Ark. Dep't of Human Servs.,* 2010 Ark. App. 444, 2010 WL 1997411. This was a companion opinion to *Thorne v. Ark. Dep't of Human Servs.,* 2010 Ark. App. 443, 374 S.W.3d 912, also issued on May 19, 2010.

Second, DHS denies that the court ever dictated how and where appellant could pray or that the court ordered appellant to "disassociate" from the church. Instead, after finding that the environment at TACM was potentially dangerous for the children of its members, a finding that was affirmed by the court of appeals, the court ordered that appellant obtain safe living arrangements and employment to support those arrangements. DHS asserts that the requirement to secure safe and appropriate housing was a valid and neutral requirement that is not subject to strict scrutiny; the targeted conduct in this case was the failure to protect children from a dangerous and abusive situation, not the exercise of any religion. DHS insists that, in this case, the state's compelling interest in protecting a child's safety prevails even though religious and parental rights are asserted.

The Free Exercise Clause of the First Amendment, which has been applied to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)). In addressing the constitutional protection for free exercise of religion, the United States Supreme Court's case law has established "the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *City of Hialeah*, 508 U.S. at 531, 113 S.Ct. 2217. Conversely, a law failing to satisfy the requirements of neutrality and general applicability "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.* at 531–32, 113 S.Ct. 2217. With regard to neutrality, the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general. *Id.* Therefore, the protections of the Free Exercise Clause "pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Id.* at 532, 113 S.Ct. 2217.

In this case, DHS's case plan required appellant to find alternative housing and employment separate from TACM. Despite the mention of TACM, these requirements were neutral and only incidentally affected appellant's exercise of her religion. The target of the requirements was not any religious activity or exercise; instead, the goal was to provide a safe environment for her children, apart from the TACM compound, which the court found was, and continued to be, an unsafe environment for the children of its members. The requirement of safe and secure housing can be applied to any parent seeking to regain custody, regardless of his or her religious practices. *See, e.g., Welch v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 798, 378 S.W.3d 290 (finding that failure to secure safe and appropriate housing is contrary to children's well-being and best interest); *Carroll v. Ark. Dep't of Human Servs.*, 85 Ark.App. 255, 148 S.W.3d 780 (2004) (same).

Although appellant argues that there was no evidence that her children in particular were at risk or had been abused or neglected, it was stipulated by the parties below that "the environment at the compound in Fouke is *potentially* dangerous for the children of its members." *Seago v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 767, at 29, 360 S.W.3d 733, 749 (emphasis added); *see* Joint Exhibit Number 1. As the court of appeals has recognized,

the court need not wait until a child has been abused or neglected to offer the protection of the state. *See Brewer v. Ark. Dep't of Human Servs.*, 71 Ark.App. 364, 43 S.W.3d 196 (2001) (noting that parental unfitness is not necessarily predicated upon the parent's causing some direct injury to the child in question and that such a construction of the law would fly in the face of the General Assembly's expressed purpose of protecting dependent-neglected children and making those children's health and safety the juvenile code's paramount concern). We also note the Supreme Court's language in *Prince v. Massachusetts,* in which it explained:

> [T]he family itself is not beyond regulation in the public interest, as against a claim of religious liberty. And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.

321 U.S. 158, 166–67, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (internal citations omitted). In sum, because the case plan's requirements do not discriminate against religious beliefs or regulate or prohibit conduct because it was undertaken for religious reasons, the protections of the Free Exercise Clause do not pertain in the instant case, and the circuit court did not err in rejecting appellant's constitutional challenge.

With respect to the opinion in *Thorne,* it appears that the court of appeals assumed that the case plan's requirements of alternate housing and employment were infringements on Thorne's right to freely exercise his religion and, based on that assumption, the court made the following findings and utilized strict-scrutiny language:

> The record is full of testimony about beatings, sexual abuse, underage marriages, and other problems, all of which victimized the children of families living on ministry property. In fashioning its case plan, the circuit court responded to the potential danger with a *narrowly-tailored* solution—requiring Thorne to obtain housing separate and apart from the ministry. And because ministry life was communal in almost every respect, the court also required Thorne to obtain employment outside the ministry so he could earn the money to pay for this new housing arrangement and other living expenses. Here, as the circuit court implicitly concluded, the State's interest in preventing potential harm to these children outweighed Thorne's conscientious choice to live on ministry property, work for the ministry, and depend on the ministry for his family's every need.

*Thorne,* 2010 Ark. App. 443, at 17–18, 374 S.W.3d at 921 (emphasis added). We do not disagree with the court's conclusion in *Thorne;* however, because we find that the case plan's requirements did not constitute infringements on appellant's constitutional rights, and thus no strict-scrutiny analysis is required, we overrule *Thorne* to the extent that it employed such an analysis.

## II. *Introduction of the Telephone Conversations*

■ This court reviews evidentiary errors under the abuse-of-discretion stan-

dard. *Ark. Dep't of Human Servs. v. Huff,* 347 Ark. 553, 65 S.W.3d 880 (2002). The trial court has broad discretion in its evidentiary rulings; hence, the trial court's findings will not be disturbed on appeal unless there has been a manifest abuse of discretion. *Id.*

As explained above, the court allowed recordings of phone conversations between Alamo and women at the ministry to be introduced at the hearing. The court ruled that the recordings were business records under Ark. R. Evid. 803(6) and thus admissible as an exception to hearsay. The court also ruled that the probative value of the recordings outweighed any prejudice.

On appeal, appellant argues that the court erred in admitting the recordings as business records because the correctional facility where the recordings were made is not a "business" but a "public office." Appellant also argues that, even assuming the correctional facility was a business for purposes of Rule 803(6), the recordings did not satisfy the criteria for admissibility. Appellant also briefly argues that the admission of the recordings violated the right to cross-examination and confrontation and that Rule 403 also justified exclusion of the recordings.

In response, DHS first asserts that the recordings were not hearsay at all because they were not offered to prove the truth of the matter asserted. Instead, the recordings were offered to show Alamo's continued control over the ministry. DHS further argues that even if some of the statements on the recording were hearsay, specifically those statements in which Alamo stated that he was in charge of the ministry, the other conversations were more than enough to show his continued control, and appellant can show no prejudice from the admission of any hearsay statements.

We agree with appellant that the recordings did not qualify as business records; however, we affirm the circuit court's admission of the recordings because they were not hearsay. Rule 801 of the Arkansas Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ark. R. Evid. 801(c) (2010). The portion of the conversations played for the court essentially pertained to the day-to-day operations of the ministry and what the members of the ministry would or would not be allowed to do, in some instances even dictating what the members should be eating. These conversations were not offered for the truth of what is actually asserted by those being recorded; instead, the recordings were offered to illustrate Alamo's continued control of the ministry. Thus, the recordings were not hearsay, and there was no error in their admission into evidence.[5]

With regard to appellant's arguments based on the right to cross-examination and confrontation, we find that appellant obtained no ruling on these arguments below, thus these issues are not preserved for our review. *See State of Louisiana v.*

---

5. While it might be argued that some statements on the CD were hearsay, specifically those statements in which Alamo asserted he was still in control of the ministry, the CD was not offered for those particular statements but to show, in general, Alamo's continued control over the affairs of the ministry. We also note that appellant's objection below was a general objection to the CD, which contained 256 conversations totalling sixty-four hours. There was no specific objection to these particular statements made by Alamo, and without a specific objection and a ruling by the court, the issue is not preserved for our review. *See Blanchard v. State,* 2009 Ark. 335, 321 S.W.3d 250.

*Joint Pipeline Grp.*, 2010 Ark. 374, 373 S.W.3d 292. Finally, while appellant did mention that Rule 403 justified the exclusion of the recordings, she failed to expand on this assertion. It is not the duty of this court to research or develop arguments for an appellant on appeal. *Green v. George's Farms, Inc.*, 2011 Ark. 70, 378 S.W.3d 715. Therefore, we will not address this argument.

### III. *Termination of Appellant's Parental Rights*

Our standard of review in cases involving the termination of parental rights is well established. Arkansas Code Annotated section 9–27–341(b)(3) (Repl. 2009) requires an order terminating parental rights to be based upon clear and convincing evidence. Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Camarillo–Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005). When the burden of proving a disputed fact is by clear and convincing evidence, the question that must be answered on appeal is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence was clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* Such cases are reviewed de novo on appeal. *Wade v. Ark. Dep't of Human Servs.*, 337 Ark. 353, 990 S.W.2d 509 (1999). However, we do give a high degree of deference to the trial court, as it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001).

In order to terminate parental rights, a trial court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark.Code Ann. § 9–27–341(b)(3)(A)(i) & (ii) (Repl.2009). Additionally, the trial court must find by clear and convincing evidence that one or more statutory grounds for termination exists. Ark.Code Ann. § 9–27–341(b)(3)(B).

The court heard testimony with regard to appellant's case on January 29, 2010. Kimberly Thompson, the case worker for the Myers family, testified that she worked with appellant and that appellant did complete parenting classes and obtain a psychological evaluation. She also testified that appellant visited her children until she was incarcerated in January 2009 for contempt of court, but during her incarceration she did have telephone contact with the children. Thompson testified that appellant's case plan was formulated after her release from jail, in August 2009, and that since appellant's release from jail, she has had supervised visits.

Thompson testified that appellant was ordered to obtain housing separate and apart from TACM, but that appellant had never indicated a willingness to do so. Thompson also testified that she tried to assist appellant in gaining employment, but appellant never participated in the job application process. Thompson also testified that appellant continued to conceal the whereabouts of her daughters. Thompson stated that she did not feel appellant was capable of making independent decisions regarding the welfare of her children or that appellant could be trusted to obey the

court orders and department requests if the children were returned to her custody.

Gayla Griffin testified that she was familiar with the Myers boys and that there were families willing to accept children with their characteristics. She conceded that one of the boys was sixteen, almost seventeen, and that it can be more difficult to place a teenager than a younger child, but she testified that there were families that would consider adopting a sibling group including a teenager. She also testified that a child must be in an adoptive placement for six months before being adopted, so it would take a minimum of six months for the boys to be legally adopted once a suitable home was found.

Appellant testified that she was incarcerated on contempt charges on January 15, 2009, and released on August 3, 2009. She testified that she was raised in the ministry, that she raised her children in the ministry, and that it was all she had ever known. She testified that she disciplined her own children when living in the ministry and that neither she nor her husband had ever sexually abused their children. She testified that in a staffing meeting in August 2009, she specifically asked a DHS worker if she would have a chance to regain custody of her boys if she obtained outside housing and employment, and the DHS worker told her probably not, because appellant had not turned in her daughters. Appellant denied any knowledge of where her daughters were and testified that she had made no effort to locate them because she believed that they were being taken care of by their father.

Appellant testified that she was in the ministry when Alamo had previously been incarcerated in federal prison and that Alamo had directed the operations of the ministry from the jail. She denied any knowledge of beatings of other children. She testified that she knew there were some girls who were married when they were young, but she did not know that some girls were married when they were twelve years old. She testified that the ministry's policy had been changed so that no one under the age of eighteen is married. She testified that Alamo continued to run the ministry, but she denied that the ministry was a dangerous environment. She acknowledged that she was unwilling to comply with a couple of requirements in the case plan, namely to seek outside employment and outside housing.

R.M., appellant's oldest son, testified that he was sixteen years old. He testified that he wished to be back home with his family and out of the foster care system. He testified that he did not want to be adopted but still wanted to have regular contact with his brothers, ages ten and six. He testified that no one other than his mother and father had ever disciplined him or his brothers and that he had never been abused. He stated that, upon turning eighteen, he would probably return to his mother and the ministry.

After hearing all testimony and closing arguments, the court made findings with regard to each parent or parents. Specific to appellant, the court made the following ruling:

> In reference to Cause Number 2008–323, this involves the Myers family. As previously announced, the Court's ruling regarding the respondent's motion of constitutional issues concerning safe and stable housing requirements, that motion is denied as previously stated on the record.

> Based upon the facts presented to the Court, the Court finds that the State has made meaningful efforts to restore the family and bring about reunification, that during the course of these proceedings the Court finds that the mother's

incarceration for contempt was self inflicted. Therefore, any loss of time that could have been spent toward achieving and complying with the case plan, any of that lost time was due to her own actions, not the State's. That the father has not participated in these proceedings up to this time and has previously and continues to hide out the other minor children of this family. That Ms. Myers has failed to comply with the case plan. There is no indication from the mother that she will comply with the case plan in the future. The Court finds that the children cannot be safely returned home.

The court held that the parental rights as to the two younger boys were terminated but that the parental rights as to R.M. were not terminated, and the court suggested that an alternative solution be formulated for R.M. The court also specifically found, based on the evidence presented, that TACM remained under the strict control of Tony Alamo. "[E]ven though his physical presence may not be on the premises, the evidence indicates to the Court that the members are still submissive to his control and direction in spite of his absence from the premises. That gives the Court great concern."

In its termination order, the court specifically considered the likelihood that the juveniles will be adopted and the potential harm, specifically the negative impact on the health and safety of the juveniles, if they were returned to the custody of their mother. Based on those considerations, the court found that termination of appellant's parental rights was in the best interest of the juveniles. The court also found that two statutory grounds under Ark.Code Ann. § 9–27–341(b)(3)(B) were present: (1) the children had resided outside the parental home in excess of twelve months, and despite a meaningful effort by the Department of Human Services to rehabilitate the home and correct the conditions which caused removal, those conditions have not been remedied by the mother; (2) subsequent to the filing of the original petition for dependency-neglect, other factors or issues arose which demonstrate that return of the juveniles to the family home is contrary to the juveniles' health, safety, or welfare, and that despite the offer of appropriate family services, the parents have manifested the incapacity or indifference to remedy the subsequent issues or factors, or rehabilitate the parent's circumstances, which prevent return of the juveniles to the family home. *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(i) & (vii).

On appeal, appellant argues that there is no evidence whatsoever that appellant's children were ever mistreated, subjected to fasting or lack of medical care, or sexually abused, nor is there any proof that the children face such dangers in the future without resorting to speculation and conjecture. Appellant argues that the sole basis for termination in this case was the possibility that the children might suffer harm in the future because of the possible continuing influence over the ministry by Tony Alamo. Appellant contends that this is mere speculation and did not constitute evidence that could support termination of her parental rights. According to appellant, this case was a "witch-hunt with fit parents caught in the crossfire and victimized by DHS in retribution for Mr. Alamo."

In response, DHS argues that appellant has failed to argue that the circuit court's findings with regard to the statutory factors were erroneous and has also failed to contest the court's best-interest finding. But, even assuming that appellant has made the proper arguments, DHS argues that the circuit court's findings were not

clearly erroneous. According to DHS, the evidence showed that appellant disregarded the potential harm to the children in the TACM environment and had no intention of leaving the compound. The evidence also showed that Alamo continues to control TACM and its members' lives and that appellant remained completely dependent on TACM for all her needs. This evidence supported the court's findings that it was not in the best interest of the children to return to appellant's custody and that appellant had manifested an incapacity or indifference to remedy the subsequent issues, i.e. separate housing and employment, or otherwise rehabilitate her circumstances.

We hold that the circuit court did not err in its findings supporting the termination of appellant's parental rights. In addition to the evidence noted by DHS, there was also an admission by appellant herself that the ministry continues to be run by Tony Alamo, which fully supports the court's finding that the compound continued to be an unsafe environment ⌊₂₂for appellant's children. Because appellant refused to remedy the conditions that caused her children's removal and that continued to act as a bar to her children's return, the circuit court did not err in terminating her parental rights.

Affirmed.