2012 Ark. App. 22
**Amanda ANDREWS, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES and Minor Children, Appellees.**

**No. CA 11–758.**

Court of Appeals of Arkansas.

Jan. 4, 2012.

Deborah Ruth Sallings, Little Rock, for appellant.

Tabitha Baertels McNulty, Little Rock, Keith L. Chrestman, Jonesboro, for appellee.

DOUG MARTIN, Judge.

The Pope County Circuit Court terminated the parental rights of appellant Amanda Andrews to her three children (N.A. born June 20, 2008; O.A. born November 14, 2006; and H.A. born February 12, 2005). Andrews argues on appeal that the trial court erred in declining to hear testimony regarding placement of the children with their maternal grandmother because it was relevant to the trial court's consideration of whether it was in the children's best interests to terminate Andrews's parental rights.[1] We affirm.

On January 15, 2010, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody of Andrews's children, alleging that they were dependent-neglected. The petition was supported by the affidavit of family service worker Melissa Waldo, who attested that, on January 12, 2010, at approximately 10:15 p.m., she responded to a report that a one-year-old child was admitted to St. Mary's Hospital for a possible drug overdose. Waldo learned that an officer with the Pope County Sheriff's Department had responded to a domestic disturbance at the child's home earlier that evening between Andrews and her male friend. The officer informed Waldo that Andrews had recently been released from the Pope County Detention Center and that the children's father was currently incarcerated at the detention center. Waldo interviewed Andrews, who told her that a friend was supposed to be "watching" her three children at the home but that the friend had gone outside, leaving the children unattended. Andrews claimed that the children had spilled what she initially believed to be sugar on the kitchen floor but that she soon realized the "sugar" was actually green powder, which she tasted and recognized as a narcotic, from a pill that had been crushed on the floor. Andrews first telephoned a friend, who advised her to observe the child and take him to the emergency room if he appeared drowsy or had dilated pupils. Andrews eventually became concerned and took the child to the hospital where Dr. David Stills confirmed that the pill containing green powder was oxycodone. Waldo's observation of Andrews during the interview led Waldo to believe that Andrews was under the influence of some unknown substance because Andrews was "fidgety," seemed nervous, and had dilated pupils. Andrews, however, denied having taken any intoxicating substance and agreed to submit to a drug test. Andrews tested positive for methamphetamine, opiates, and benzodiazepines. Andrews then stated that she had "messed up." Waldo determined that placing a seventy-two-hour hold on the children was

---

1. The father's parental rights to the children were terminated at the same time; however, he is not a party to this appeal.

necessary due to Andrews's substance abuse, inadequate supervision of the children, and domestic disturbances in the home.[2]

On January 15, 2010, the trial court found probable cause to believe Andrews's children were dependent-neglected. Andrews was ordered to submit to random drug screens; attend and complete parenting classes; obtain and maintain stable and appropriate housing; obtain and maintain stable and gainful employment; attend Narcotics Anonymous/Alcoholics Anonymous (NA/AA) meetings; submit to and successfully complete inpatient drug treatment; and watch a video called "Clock is Ticking."

Following a hearing on February 14, 2011, the trial court entered a permanency-planning order on April 4, 2011, in which the trial court changed the goal of the case from reunification to parental termination and adoption. Also, the trial court ordered that a home study be conducted on the residence of the children's maternal grandmother, Barbara Berry, upon Berry's notifying DHS in writing within thirty days of the February 14, 2011 hearing that she had a home to be studied.

At the termination hearing, Andrews testified that she had lived at five or six homes since the DHS case was opened and that her current living arrangement with her sister was not permanent. Andrews stated that she had a few jobs of short duration but that she was currently unemployed. Andrews testified that she completed parenting classes and inpatient drug rehabilitation. Andrews conceded, however, that she subsequently tested positive for benzodiazepines and was discharged from outpatient drug rehabilita-

tion for failure to comply with the treatment plan.

Angel Deal, a caseworker for the Division of Children and Family Services (DCFS), testified that, because Andrews moved so often, only one random drug test was administered in a six-month period. Deal testified that she was able, however, to test Andrews weekly prior to visitation with the children and that Andrews tested positive eight times and had positive drug screens from Freedom House (an alcohol-and-drug-treatment center in Russellville) as well. Deal stated that Andrews offered various implausible excuses for testing positive for drugs. According to Deal, Andrews did not follow recommendations from inpatient drug rehabilitation and did not provide DHS with any documentation with respect to her attendance at NA/AA meetings and outpatient counseling. Deal described Andrews's children as "adorable" and testified that the likelihood of adoption was "very high." Deal further testified that, although O.A. was currently in therapeutic foster care, DHS's plan was for all three children to be adopted as a sibling group.

Teresa Hamilton, the therapeutic foster-care coordinator with Community Service, testified that O.A. was responding well to treatment and had demonstrated significant improvement. Hamilton stated that O.A. likely would be discharged soon from therapeutic foster care, so the plan for adoption could proceed.

Angela May, program assistant for DCFS, testified that Andrews missed nineteen out of sixty-six visits with her children. May stated that twelve of the missed visits were due to failed drug

---

**2.** Waldo included in the affidavit that a CHRIS (County Health Reporting Information System) search revealed unsubstantiated reports of inadequate supervision and striking of a child in July 2008; inadequate supervision in April 2009; and environmental neglect and inadequate clothing in August 2009.

screens; a couple of visits were missed because Andrews was in jail; and a couple of visits were missed because Andrews could not provide a urine sample for testing. According to May, the visits initially "went pretty smooth" but had "sort of gone downhill." May asserted that this deterioration in the quality of visitation primarily was due to O.A.'s misbehavior and Andrews's reluctance to discipline O.A.

On redirect examination, Andrews testified that she was "finished messing around with pills." With respect to outpatient drug rehabilitation, Andrews stated that she "got sick of" being told that she was still using drugs. Andrews denied avoiding Deal in her attempts to visit Andrews at her home. Andrews testified that, approximately two weeks after the permanency-planning hearing, her mother bought a house. According to Andrews, a home study was conducted on Berry's new home but "[t]hey denied it because they said that my mom did not make enough money and that they were worried about me coming around after she had got the kids." [3] Andrews asked the trial judge to place her children with Berry rather than terminate her parental rights. She testified that Berry would care for the children and that her family would help. Andrews added that she would "stay away if [she had] to."

Barbara Berry testified that she had lived at her home in Russellville for three months and that she bought the house because the trial court ordered that a home study be conducted. Berry stated, however, that she had "flunked" the home study and that DHS did not recommend that the children be placed with her.

At that point in Berry's testimony, the attorney ad litem objected, arguing that Berry's testimony was irrelevant at a hearing on termination of parental rights. Andrews's attorney responded that, given that the trial court had previously ordered a home study, it stood to reason that the trial court would consider the home study at the termination hearing. The trial court ultimately agreed with the attorney ad litem, ruling that alternative placement was not relevant at a hearing on a petition for termination of parental rights but that the matter could be relevant at another hearing. The court noted that permanency-planning hearings were often held after termination hearings, "so even if the court were to grant the petition to terminate here today, the court can still consider alternative placements, alternative goals later at other hearings."

Berry continued with her testimony and expressed both her love for the children and her concern that her relationship with them was in jeopardy in the event the trial court terminated her daughter's parental rights. Berry testified that, before the children were taken into DHS custody, she saw the children four or five days each week and often babysat them. Berry testified that she missed the children and was willing to do whatever it took to get the children back, including taking a second job.

On April 28, 2011, the trial court entered an order terminating Andrews's parental rights to her three children on the following two grounds: (1) the juveniles were adjudicated dependent-neglected due to Andrews's drug abuse and inadequate supervision and had continued out of Andrews's custody for twelve months and, despite a meaningful effort by the depart-

---

**3.** A CASA (Court Appointed Special Advocates) report in the record indicates that Berry's home was vandalized by a man that Andrews had dated and that windows that were broken as a result of the vandalism had not been replaced.

ment to rehabilitate Andrews and correct the conditions that caused removal, the conditions had not been remedied by Andrews, and (2) subsequent to the filing of the original petition for dependency-neglect, other factors or issues arose which demonstrated that return of the juveniles to Andrews's custody was contrary to the juveniles' health, safety or welfare and, despite the offer of appropriate family services, Andrews had manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate her circumstances which prevented the return of the juveniles to her custody. Specifically, the court noted that, with respect to the second ground for termination, Andrews had an unresolved drug problem; had not obtained stable housing; and had not maintained gainful employment. The trial court noted that there was a high likelihood that the children would be adopted based on the undisputed testimony of Deal and Hamilton.

On appeal, Andrews argues that the trial court erred in refusing to consider, as an alternative to terminating her parental rights, evidence that Berry was willing to provide the children with a good home because it was relevant to the overall issue of the children's best interests. Andrews contends that, while the legislature's goal for permanency "inexplicably places adoption over a placement with a loving relative," the legislature did not intend to foreclose consideration of other alternatives in appropriate situations.

We review termination-of-parental-rights cases de novo. *Meriweather v. Ark. Dep't of Human Servs.*, 98 Ark.App. 328, 255 S.W.3d 505 (2007). In cases where the issue is one of termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. *Trout v. Ark. Dep't of Human Servs.*, 359 Ark. 283, 197 S.W.3d

486 (2004). Termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *Id.* Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well being of the child and must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children. *Camarillo–Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005). Pursuant to Arkansas Code Annotated section 9–27–341(b)(3) (Repl.2009), an order terminating parental rights must be based upon clear and convincing evidence, i.e., proof that will produce in the fact-finder a firm conviction as to the verity of the allegation sought to be established. *Camarillo–Cox, supra.* We do not reverse a termination order unless the trial court's findings are clearly erroneous. *Id.* A finding is clearly erroneous when the appellate court is, on the entire evidence, left with a definite and firm conviction that a mistake has been made. *Id.* In deciding whether a finding of the trial court is clearly erroneous, we give great deference to the superior opportunity of the trial court to observe the parties and judge the credibility of witnesses. *Id.*

Pursuant to Arkansas Code Annotated section 9–27–341(b)(3)(A), an order terminating parental rights must be based on a finding that termination is in the child's best interest, which includes consideration of the likelihood that the juvenile will be adopted and the potential harm caused by returning custody of the child to the parents. Also, an appropriate permanency-placement plan is a prerequisite to the circuit court's consideration of a termination petition. Ark.Code Ann. § 9–27–341(b)(1)(A). In addition, the proof must establish at least one of several statutory grounds set forth in Arkansas Code Anno-

tated section 9–27–341(b)(3)(B), which provides in relevant part:

(i)*(a)* That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

. . . .

(vii)*(a)* That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.

Andrews does not argue that the statutory grounds supporting termination of her parental rights were not proved by clear and convincing evidence. Rather, she challenges the trial court's best-interest analysis. Andrews's argument on appeal has evolved from the issue she raised at the termination hearing. A party cannot change her argument on appeal and is bound by the scope of her arguments made to the circuit court. *Holiday Inn Franchising, Inc. v. Hospitality Assocs., Inc.*, 2011 Ark. App. 147, 382 S.W.3d 6. Even in termination cases, we will not address arguments raised for the first time on appeal. *Lyons v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 271, 2009 WL 1017710.

Even assuming that Andrews's arguments were preserved, we would not disturb the trial court's decision. At the ter-mination hearing, Andrews argued that the trial court should consider the home study on Berry, and the trial court's denial of the argument was an evidentiary ruling. This court reviews evidentiary rulings under the abuse-of-discretion standard. *Myers v. Ark. Dep't of Human Servs.*, 2011 Ark. 182, 380 S.W.3d 906. The trial court has broad discretion in its evidentiary rulings; hence the trial court's findings will not be overturned on appeal unless there has been a manifest abuse of discretion. *Id.* We cannot say that the trial court abused its discretion in limiting Berry's testimony because alternative placement was irrelevant at the termination hearing. Andrews's argument on appeal, which has expanded to include that the trial court erred *in terms of the best-interest analysis* by not considering alternative placement with Berry, is not persuasive because the statute Andrews cites and relies upon on appeal does not apply to hearings on termination of parental rights.

Arkansas Code Annotated section 9–27–355(c)(1) (Repl.2009) provides that "a relative of a juvenile placed in the custody of the department shall be given preferential consideration for placement if the relative caregiver meets all relevant child protection standards and it is in the juvenile's best interest to be placed with the relative caregiver." Andrews's reliance on this statute is misplaced because it applies to the initial placement of a juvenile after being taken into DHS custody. *See, e.g., Dubois v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 401, 2011 WL 2140375. The termination statute, Arkansas Code Annotated section 9–27–341, does not contain a similar provision.

Despite the trial court's ruling to limit testimony concerning placement of the children with Berry, the evidence, including testimony by both Andrews and Berry,

revealed that Berry's home was an unsuitable placement at that time. Our de novo review does not leave us with a definite and firm conviction that the trial court made a mistake in terminating Andrews's parental rights.

Affirmed.

HART and GLOVER, JJ., agree.